No. 39,684

TERRY L. HADDOCK and EMMETT P. CAIN, doing business as the Seabrook Appliance Company, a Partnership, *Appellees*, v. DAVID KELLER and NORMA KELLER, his wife, *Appellants*.

(285 P. 2d 1093)

Opinion filed July 6, 1955.

*Tinkham Veale*, of Topeka, argued the cause and was on the briefs for the appellants.

*Donald Patterson*, of Topeka, argued the cause, and *David H. Fisher*, of Topeka, was with him on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: This was an action for damages of a punitive nature alleged to have resulted from the wrongful cancellation of a lease.

On June 4, 1952, Terry L. Haddock and Emmett P. Cain, hereinafter called plaintiffs or referred to individually, filed a petition in the district court of Shawnee County against David Keller and Norma Keller, his wife, hereinafter referred to as defendants or Keller. His wife was made a party simply because she had signed the lease. In this petition plaintiffs gave their residence as Burlington, Coffey County, Kansas. The petition alleged that about August 15, 1951, Haddock resigned his employment with the Maytag Company of Newton, Iowa, for the purpose of opening a retail appliance store with the plaintiff Cain as a partner; that about September 15,

1951, Haddock, acting for the partnership, and the defendants Keller and his wife orally agreed to lease to plaintiffs the realty and building attached thereto known as 1939 Gage Boulevard in Shawnee County for the remainder of the month of September and thereafter from month to month commencing on the first day of each month; that Haddock paid to Keller $47.50 for the time from September 15, to September 31 (sic), and agreed to pay defendants $95. per month on the first day of each month thereafter until the month to month termination of the lease; that on September 30, defendants conveyed to the plaintiffs a leasehold estate for a period of three years upon said real property; that this agreement was by written lease, a copy of which was attached; and that at all times thereafter plaintiffs substantially performed their obligations described in the lease and made the rental payments until they were evicted by defendants in the following manner:

That on November 10, 1951, plaintiffs delivered to defendant Keller a check which check was accepted as the rent payment for November; that about November 17, the check was returned to plaintiffs in a letter addressed to them and signed by defendants' attorney; that during the period from November 1 to November 17, while plaintiffs were in possession under the lease, the defendants, or persons unknown to plaintiffs, acting under their direction removed the locks from the entrances to the leased premises and installed new locks thereon and thereby deprived plaintiffs of the possession and enjoyment of the premises; that plaintiffs made numerous demands for repossession of the premises but defendants at all times refused; that plaintiffs leased the premises and paid the rent thereon for the purpose of establishing a retail appliance store; that they had been promised a franchise by the Maytag Company of Newton, Iowa, giving them the right to receive a quota of merchandise from that company, except said promise of the Maytag Company was conditioned upon the plaintiffs having their retail store located on the premises described in the lease and in no other location. That defendants were notified by plaintiffs of the investment in time and money in preparation of opening their store. The petition then set out certain items of expense alleged to have been caused by the acts of defendants. The prayer was for judgment for $5,027.50.

The defendants' answer admitted the making of the lease substantially as alleged by plaintiffs but alleged their negotiations were

with plaintiff Cain and not Haddock. The answer further alleged that about November 1, Keller had a talk with Cain by telephone in which Cain stated that plaintiffs had met with financial difficulties in carrying out their plans in occupying the building leased from defendants; that a person, whose name was not disclosed, from whom they were intending to get funds to purchase merchandise and fixtures and pay operating costs in conducting the business they intended to operate, had failed and refused to advance the monies necessary for that purpose, and on that account plaintiffs would be unable to use or occupy the building and requested defendants to release plaintiffs from their obligation of the lease, to permit them to surrender the same, and requested defendants to lease the building to other parties. That defendants agreed to the cancellation of the lease and requested plaintiffs to bring the lease and keys to the office which plaintiff Cain said they would do. That in pursuance with the request of Cain defendants procured the services of real estate brokers, W. T. Dawson and Company, who did procure another tenant, the Miller Drug Company, to whom defendants leased the premises. That about November 8, Keller talked with Cain by telephone and informed him he had leased the building to the Miller Drug Company and asked him to return the lease and keys to his office; that Cain advised Keller he had been to the office on November 3, to surrender the lease and keys but could not find Keller in the office and took the lease and keys back with him and that since that time he had secured another person whom he thought would finance them in the undertaking, and said plaintiffs had changed their minds and did not want to give up the building.

It was further alleged that about November 9, after the agreement with plaintiffs to the cancellation of the lease and after defendants had leased the building to the Miller Drug Company, relying upon the statements and agreements of plaintiffs, plaintiffs came to the residence of defendants and asked defendants to give them another 24 hours in which to procure new financial backing for their proposed business. That the defendant Keller stated to plaintiffs that he had already leased the building to the Miller Drug Company and could not enter into additional agreements with plaintiffs. That about November 10, plaintiffs came to defendant Keller's office again and insisted that defendants let them have the building but Keller again informed plaintiffs the building was leased to the Miller Drug Company and that if the Dawson Realty Com-

pany could induce the Miller Drug Company to release them from the lease he would give plaintiffs an opportunity to lease the same; that plaintiffs insisted that defendants accept the November rent which was due November 1, but that defendant Keller refused to accept it, at which time the plaintiffs threw the check on the desk of defendant and left his office; that a few days later defendants' attorney returned the check to plaintiffs with a letter stating in substance that upon reliance of Mr. Cain's statement that plaintiffs could not financially go ahead with their lease and had promised to return the lease and keys to him, defendants felt justified in leasing the building to the Miller Drug Company.

To this answer plaintiffs filed a reply consisting of a general denial and a specific denial of the paragraphs in the answer which set up defendants' defense.

The case went to trial on March 8, 1954, with the result that the jury found for the plaintiffs in the sum of $3,027.50, and answered special questions.

Defendants' motion to set aside answers to certain of the special questions as not being supported by the evidence, and for judgment for defendants upon the answers to the other special questions was overruled, as was their motion for a new trial. The defendants have appealed.

In this court the principal question argued is whether, under the facts shown by the evidence, defendants' motion to strike answers to certain questions and for judgment on the others should have been sustained.

As pertaining to this question, the special questions and answers are as follows:

"1. Did the defendants deprive plaintiffs of possession of the leased premises by causing the locks on all entrances to the building to be changed? Answer. Yes.

"2. Did the plaintiffs, at any time, while they had possession of the leased premises, offer to cancel their lease and surrender possession of the premises? Answer. Yes.

"3. If you answer question number two in the affirmative, state whether the offer was oral or written? Answer. Oral.

"4. If you answer question two in the affirmative state whether the offer was accepted by defendants before it was revoked or withdrawn by plaintiffs. Answer. No."

Number 5 not pertinent here.

"6. After the lease, dated September 30, 1951, was entered into between plaintiffs and defendants, did plaintiff Cain, about November 1, 1951, advise

defendant David Keller that plaintiffs could not carry out the terms of the lease and request Keller to release plaintiffs from the obligations of the lease and procure another tenant? Answer. Yes.

"7. Did defendant David Keller consent to the cancellation of the lease and procure another tenant at plaintiffs' request? Answer. No.

"8. Did plaintiffs spend any money in preparing the room they had leased for their occupancy between September 15th 1951 and November 1, 1951? Answer. No."

Number 9 not answered.

"10. Did plaintiffs ever procure a franchise from the Maytag Company to sell Maytag products in the room leased from defendants? Answer. No, but it is apparent that they could procure franchise."

Defendants filed a motion to set aside the answers to special questions Nos. 4, 5, 7 and 10 for the reason that the answers were contrary to the evidence and not supported by the evidence, and to render judgment for defendants on the answers to questions Nos. 2, 6, 8, 9 and 10. This motion was denied. We think it should have been allowed.

Question No. 4 inquired whether the offer mentioned in question No. 2 was accepted by defendants before it was revoked or withdrawn by the plaintiffs. The jury's answer was no. The evidence respecting that matter may be summarized as follows: The last week in October both of the plaintiffs saw Mr. Keller and told him in substance that the man whom they had relied upon to furnish the money to finance the business had declined to do so and they might have to give up the lease; that they would tell him definitely about that on November 1, which was the date the next lease payment was due. On that day Cain called Keller and told him they had not been able to make any other financial arrangements and that they would surrender the lease and keys. Keller told him to bring them to his place at his convenience. When Cain and Haddock had talked with Keller in the latter part of October Keller spoke of a Mr. Blaylock, who had a drugstore down in the business part of the city, who might want to rent it. On November 1, Cain called him and told him they would surrender the lease and keys; they talked again about Mr. Blaylock and Cain suggested that Keller see him and ask him if he would care to lease it. Keller did contact Mr. Blaylock who looked at the property on November 2; thought the room too small for the fixtures he planned to use, and said he wouldn't take it. Keller called Cain that same evening and reported that fact to him, and also placed the property in the hands

of the W. T. Dawson and Company realtors to get him another tenant. He also told Cain in that conversation that if he could get someone else to finance them before he leased the property he would give the plaintiffs an opportunity to go ahead. The Miller Drug Company, which had been operating a drugstore at Sixth and Topeka Boulevard for a number of years, had been notified to move by December 1, 1951, because the owners desired the building. On November 7, Mrs. Miller was driving through Seabrook, saw the empty building, and went to the real estate agency of Dawson and Company. Mr. Dawson got the keys and showed the building to Mrs. Miller. She said she would like to have her husband see it and perhaps they would rent it. She contacted her husband who went out and looked at the property and told Mr. Dawson they would take it, and left with him a check for $95. for the first month's rent, a contract to be drawn later. When he went to his office Miller wrote a letter to Dawson confirming the agreement. The next day Dawson advised Keller of the fact that he had leased the property to the Miller Drug Company and showed him Mr. Miller's letter. That same evening Keller talked to Cain and advised him that he had leased the property and asked that the lease and keys be returned to him. Cain replied that they had found another backer whom they thought would finance them and they had changed their minds about surrendering the lease. This was the first time Keller was informed that plaintiffs had other backing. It necessarily follows that the jury's answer to question No. 4 was not supported by the evidence.

We think the jury's answer to question No. 5 should have been stricken because it followed an erroneous instruction of the court as to the measure of damages. Plaintiffs had requested an instruction in substance to this effect: That if the jury found the terms of the lease to be fair and reasonable rental value of the property (there is no contention it was not) that plaintiffs in any event could recover only nominal damages of $1. plus any necessary expense incurred by plaintiffs and within the contemplation of the parties in preparing the leased premises for the use of the plaintiffs. (In answer to question No. 8 the jury found they had spent nothing in getting the place ready for occupancy.) The court refused to give the requested instruction but gave one much more liberal to plaintiffs, which the jury followed in its answer to question No. 5. We shall not reverse the case for this reason, however, for if the motion

now being considered is good, the amount of the verdict is unimportant.

The answer to question No. 7 should have been stricken for very much the same reason given in our discussion of question No. 4. But, more than that, the evidence distinctly discloses that at the time of plaintiffs' talk with defendant in the latter part of October Mr. Blaylock was spoken of as the man who might care to lease the property and when Cain talked with Keller on November 1, Keller was asked to contact Blaylock to see if he would lease it, which Keller did, and when Blaylock declined to lease the property Keller placed it in the hands of W. T. Dawson and Company to get a tenant for him. So, it is clear from the evidence that Keller was willing to have plaintiffs surrender the lease if they could not get another financial backer. It must be remembered plaintiffs had signed a written contract to pay the rent for three years. Legally speaking, Keller could have insisted upon those payments. His offer to cancel the lease if he could get another tenant was favorable to plaintiffs rather than otherwise.

The jury's answer to question No. 10 was fully answered by the word "no." The remainder of the answer should have been stricken as being surplusage. More than that, it is inaccurate as further discussion will disclose.

The facts leading up to the execution of the lease between plaintiffs and defendants may be summarized as follows: The Maytag Company of Newton, Iowa, manufacturers of washers and other household appliances, sells to local retail dealers throughout the country to whom it has issued franchises. It has a general sales manager in Newton, branch managers in various states, and regional managers over certain specific territories. In 1951, and for several years prior thereto, Mr. Ernest F. Philpy was regional manager of the Maytag Company for an area of 22 counties in northeastern Kansas, including Shawnee. A part of his business was to select one or more retail dealers in each city of his territory who, in his judgment, would make good retail dealers for the Maytag products, make inquiry into their location, financial status, and other matters that would determine their fitness for an exclusive franchise for the sale of Maytag products in that locality. The company had issued two franchises in Topeka; one to Ed Marling, who had two large stores, one in the 600 block on Kansas Avenue and the other in North Topeka, and the other to Jones-Mack, Inc., who had a large

store in the 500 block on Kansas Avenue. Plaintiffs had been employed as salesmen for Jones-Mack, Inc., and Philpy became acquainted with them. They frequently asked Philpy for larger allotments of Maytag products. Philpy regarded them as good salesmen and had a high personal regard for them. They talked to him about getting a retail store and a franchise for the sale of Maytag products at some location in Topeka. Philpy thought an additional store in Topeka should be in the Seabrook neighborhood. He testified: "I told them that if they would get a location in Seabrook and get financed properly that we would write a franchise for them." We think the evidence disclosed that Philpy's recommendations would have been sufficient to enable them to get the franchise if the conditions mentioned could have been met by plaintiffs. The real trouble was to get "financed properly." Philpy made two attempts to assist them. The first man he contacted was Mr. V. J. Robinson who was familiar with the Maytag products and the method of the Maytag Company of doing business, and at one time had been either their regional or district manager for an area which included Shawnee County. Since he had retired from working for the Maytag Company he had financed several retail dealers of Maytag products. Philpy arranged a meeting between plaintiffs and Mr. Robinson at the Kansan Hotel on some date not stated, but which was perhaps early in 1951. Mr. Robinson seemed favorably impressed with plaintiffs and the outline of the business made by Philpy, but said he had other business interests and did not want to take the matter on at that time. No definite commitment was made. Soon thereafter Mr. Robinson became seriously ill, was in a hospital several weeks, and confined to his home in California for some time thereafter. No serious effort was ever made later to have him finance plaintiffs. The evidence disclosed clearly the reason proper financing was important; the Maytag Company ships no merchandise to retail dealers unless it receives the cash, the retail dealers sell much of the Maytag products on time, with small weekly or monthly payments. They take notes from purchasers, which, unless they are financially able to carry themselves, such notes must be assigned to someone to get money to purchase more merchandise. They sometimes have large sums tied up in notes. Plaintiffs had procured from various relatives sums of money to be repaid from the business, which aggregated about $3,000. Cain testified that the $3,000. wouldn't go far

in equipping the store with fixtures, paying help, and buying merchandise for which they had to pay cash and sell on time. Philpy recommended another source from which they might get sufficient financing. This was the Commerce Acceptance Corporation with headquarters at Atchison. It had financed several Maytag dealers in Atchison, Leavenworth, and smaller cities thereabout, and as far south as Valley Falls but had not financed any dealers in Topeka. Mr. N. G. McKenzie, manager of the Commerce Acceptance Corporation, testified that sometime in September, 1951, he had contact with, or an inquiry from, plaintiffs regarding this type of business. He heard nothing further from them until November 7, 1951. At that time they made no formal application but apparently did contact his assistant, Mr. Barnes, sufficiently to cause his company to start a temporary investigation. He found in his files a carbon copy of a letter dated November 13, apparently written by Mr. Barnes and addressed to the Seabrook Appliance Company, 1939 Gage Boulevard, Topeka, which simply set out the "floor plan" which the Commerce Acceptance Corporation would use in transacting such business with the plaintiffs, and which stated that Mr. Hutchinson of their company would want to have a personal interview with them. Each of the plaintiffs testified they had never seen the original letter, the carbon copy of which Mr. McKenzie had found in his files. Nothing further is disclosed about any financial arrangements with the Commerce Acceptance Corporation, or with anyone else. The result was plaintiffs made no financial arrangements with anyone and because of that Mr. Philpy never did recommend plaintiffs to the Maytag Company for a franchise. So, the only answer the jury was justified in making to question No. 10 was the single word "no."

The answers to the other special questions clearly show that defendants should have judgment. The answer to the first question, not discussed here by either party, was a finding of what any landlord would do when changing tenants.

This was not an action brought to force the continuance of plaintiffs' lease; indeed, perhaps the best thing that happened to plaintiffs was to be able to surrender the lease rather than to have to continue payments of rental for three years. This action was one brought more than six months after the lease was terminated, for damages which really arose from plaintiffs' lack of getting financial help to start and maintain a business. Keller was not responsible

for that. His leasing the property to another tenant was done at plaintiffs' request, before he knew plaintiffs *thought* they had another financial backer; even this *thought* proved to amount to nothing effective. There is no reason why Keller should return the money paid him for rent or pay them for their telephone calls and trips to Kansas City to hire help and to get other lines of merchandise to handle. Indeed, there is nothing to indicate that he knew they were doing so, nor to show that they had any success, nor to justify other items of the verdict. Much more might be said concerning matters shown by the record which would be of no service to plaintiffs but we think it unnecessary to do so.

The result is that the judgment of the trial court should be reversed, with directions to sustain defendants' motion to strike the answers of the jury to questions Nos. 4, 5, 7, and the surplusage in the answer to question No. 10, and to render judgment for defendants upon the answers to the other special questions notwithstanding the general verdict. It is so ordered.